# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTWOIN T. JUDD, #425-948 | * | |
| Plaintiff | * | |
| v | * | Civil Action No. JFM-15-1150 |
| JANICE GILMORE, RN | * | |
| CARLA BUCK, RN | | |
| WEXFORD MEDICAL SOURCES, INC.[1] | * | |
| Defendants | * | |

***

## MEMORANDUM

Antwoin T. Judd ("Judd") has filed a civil rights complaint under 42 U.S.C. § 1983, seeking money damages and declaratory relief against Wexford Health Sources, Inc. ("Wexford") and two of its employees. Judd, a self-represented prisoner housed at the Western Correctional Institution in Cumberland, Maryland ("WCI"), alleges that his Eighth Amendment right to medical care was violated over a seven month period when prison health care providers at WCI ignored "numerous requests . . . to be seen and treated for fever, vomiting, diarrhea [and] malaise." ECF No. 1 at 3. Judd also alleges he was denied HIV testing and hormone treatment required for "gender re-assignment" purposes.[2] *Id.* As a result, Judd claims his health has worsened and he has suffered "physical and mental distress and discomfort." *Id.* at 4.

Pending is a motion to dismiss or, in the alternative, motion for summary judgment filed on June 25, 2015, on behalf of the medical defendants (ECF No. 5), which is opposed by Judd.[3]

---

[1] The Clerk shall amend the docket to reflect the proper spelling of this defendant's name.

[2] Individuals with Gender Dysphoria, also known as Gender Identity Disorder ("GID"), feel strongly that they are not the gender they physically appear to be. They sometimes are referred to as "transgendered." Gender dysphoria is not homosexuality; one's internal sense of gender is not the same as one's sexual orientation. *See* http://www.webmd.com/mental-health/gender-dysphoria.

[3] The medical defendants have filed a reply to Judd's opposition response. ECF No. 10.

ECF No. 8. No hearing is needed to resolve the issues raised in the complaint. *See* Local Rule 105.6 (D. Md. 2014). For the following reasons, the dispositive motion will be granted.

I. LEGAL ANALYSIS

A. Standard of Review – Motion to Dismiss

"'The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). A Rule 12(b)(6) motion constitutes an assertion by defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted. " Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "'accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff.'" *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

B. Standard of Review – Motion for Summary Judgment

"When matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998) (alteration in the original) (quoting Fed. R. Civ. P. 12(b)) (internal quotation marks omitted). Under Federal Rule of Civil Procedure 56, the court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Once a motion for summary

judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (alteration in the original). A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; accord *Hooven-Lewis*, 249 F.3d at 265.

C. Amenability to Suit under 42 U.S.C. § 1983

Defendant Wexford argues that it should be dismissed from the case because as a corporate entity it cannot be held liable under 42 U.S.C. § 1983. ECF No. 5-1 at 8-9. The court agrees. Under § 1983, liability is imposed on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights...." 42 U.S.C. § 1983. The statute requires a showing of *personal* fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *West v. Atkins*, 815 F.2d 993, 996 (4th Cir.1987), rev'd on other grounds, 487 U.S. 42 (1988) (no allegation of personal involvement relevant to the claimed deprivation); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977) (in order for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be

"affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights ...") (quoting *Bennett v. Gravelle*, 323 F.Supp. 203, 214 (D.Md.1971), *aff'd*, 451 F.2d 1011 (4th Cir.1971)).

Moreover, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services*, 316 Fed. Appx. 279, 282 (4th Cir. 2009).

D. Alleged Violation of the Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), and scrutiny under the Eighth Amendment "is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003). In the context of denial of medical care, an Eighth Amendment violation arises when the actions of a defendant, or the failure to act, amount to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

II.  Discussion

The medical records clearly establish that medical personnel, including the named defendants, were not indifferent to Judd's serious medical need. Judd, age 23, has a mental health history for depression and other problems, as well as asthma.

Wexford personnel first performed an initial assessment of Judd's mental and physical health on May 29, 2014. ECF No. 6-1 at 36. Judd reported his drug and alcohol history and asthma and indicated he previously had been provided mental health services. He did not mention suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

On September 5, 2014, while housed at Maryland Correctional Institution - Jessup ("MCI-J"), Judd was seen by Nicole Taylor, L.C.P.C. for a mental health visit. *Id.* at 22-23. Judd seemed lethargic, but stated that he had just woken up. He denied any concerns, voiced no complaints, and made no mention of suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

On September 17, 2014, Judd was transferred from MCI-J to WCI. *Id.* at 37-38. Defendant Buck reviewed Judd's medical records and performed an intake screening, during which Judd expressed no behavioral or mental health issues or concerns and made no mention of suffering from GID or previously receiving or requiring hormone therapy. Buck recommended Judd be seen as a chronic care inmate for his asthma. *Id.*

The next day, on September 18, 2014, Judd was seen by Peggy Mahler, R.N.P. for a provider chronic care visit to assess his asthma. *Id.* at 1-3. Judd's respiratory symptoms were stable but aggravated by weather. *Id.* Judd had been provided Albuterol and Qvar inhalers for his asthma and had experienced no asthma symptoms in the prior two weeks. *Id.* Judd voiced no complaints or concerns, and made no mention of suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

Judd received a mental health assessment on September 23, 2014, by mental health provider Jonathan Hess. *Id.* at 24-26. Hess noted that Judd was not taking any medication for

5

mental health issues. *Id.* Judd again voiced no complaints or concerns during this visit and made no mention of suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

On October 21, 2014, Judd was seen by Dennis Martin, R.N., for complaints of left wrist discomfort and a left knee abrasion related to a basketball injury. *Id.* at 4-5. Martin noted that Judd had been seen by a physician for his injuries and provided with first aid and a wrist splint. *Id.* Judd did not mention suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.* At Judd's October 24, 2014, follow-up visit for the injury, he was informed that x-rays revealed no fractures, dislocations, or subluxations. The hand was swollen, and Judd was prescribed 800 mg Motrin three times daily for one month. *Id.* at 6-7. Judd did not mention suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

On October 29, 2014, Judd was again seen for his wrist injury. *Id.* at -9. He was prescribed Tylenol for pain. *Id.* Judd made no mention of suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

At a November 11, 2014, visit, Judd complained that his left wrist still bothered him and the pain was worsening. *Id.* at 10-11. Judd was continued on Motrin and Tylenol and a wrist brace was ordered. *Id.* Again, Judd failed to mention GID or hormone therapy. *Id.*

On November, 13, 2014, Judd had an individual therapy session with mental health provided Hess. *Id.* at 27-28. Judd stated having audio and visual hallucinations, and indicated he had stopped taking prescribed mental health medications months ago because he felt he was stable. *Id.* Judd did not mention GID or hormone therapy.

On November 17, 2014, Judd was seen by Stephen Schellhase, M.D. for an initial psychiatric evaluation. *Id.* at 29-32. He appeared to be depressed, angry and frustrated. *Id.* Judd agreed to try 20 mg Prozac, and stated that he is homosexual. *Id.* He voiced no additional complaints or concerns and made no mention of suffering from GID, previously receiving hormone therapy or requiring hormone therapy. *Id.*

On November 26, 2014, Plaintiff received his wrist brace. *Id.* at 12. On December 16, 2014, he refused to attend a scheduled chronic care visit for asthma. *Id.* at 13. He also refused to attend a scheduled January 12, 2015 asthma chronic care visit with Robustiano Barrera, M.D. *Id.* at 14. He did attend his February 6, 2015 chronic care visit for asthma, where it was determined he no longer needed the Qvar inhaler and could use his Albuterol inhaler when needed. *Id.* at 15-16. Judd did not mention suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

On February 26, 2015, Judd refused a scheduled mental health visit with Dr. Schellhase, despite knowing that his mental health medication would be discontinued. *Id.* at 33-35.

Judd was seen by Nurse Klepitch on April 19, 2015, following an asthma attack caused by pepper spray used on another prisoner on his tier. *Id.* at 17-18. He was placed on oxygen and administered an Albuterol nebulizer treatment. *Id.*

On April 21, 2015, Judd accepted an offer of HIV testing which proved negative. *Id.* at 19. He voiced no complaints or concerns during this visit and made no mention of suffering from GID, previously receiving hormone therapy, or requiring hormone therapy. *Id.*

The following day, on April 22, 2015, Judd filed his civil rights complaint. ECF No. 1.

On May 1, 2015, Judd was seen by Colin Ottey, M.D. for a provider chronic care visit related to his asthma. ECF No. 6-1 at 20-21. During the visit, for the first time since his

7

incarceration at WCI in September, 2014, he alleged that he was previously receiving estrogen therapy while incarcerated at MCI-J. *Id.* Dr. Ottey reviewed Judd's medical and mental health records and found no prior documentation regarding a GID diagnosis or hormone treatments. *Id.*

Judd, "on oath under penalty of perjury," states that he requested hormone treatments from Buck on several occasions and made additional requests, orally and in writing, to Gilmore.[4] He further avers that his requests were made on proper medical request forms that are under defendants' custody and control. ECF No. 8 at 1. Judd states that he has not been seen by any medical providers since commencing this action. ECF No. 8-2.

Evidence produced thus far establishes that Judd's general ailments, such as asthma, HIV testing, and wrist injury, received appropriate attention and treatment by prison health care providers. Judd does not detail when he suffered from "fever, vomiting, diarrhea [and] malaise," (ECF No. 1 at 3), but it is apparent that he had many opportunities to raise such complaints during visits with health care providers since his September 17, 2014 transfer to WCI. Judd has suffered no actual injury as a result of the basic health services provided, notwithstanding his refusal to regularly attend chronic care clinics and avail himself of mental health services, including medication.

The crux of Judd's claim is that he believes he suffers from GID and requires hormone therapy.[5] Judd provides no details as to when he spoke with or wrote to Buck and Gilmore, two nurse professionals, concerning his disorder. The medical record submitted to the court suggests

---

[4] The medical record shows no occasion on which Gilmore personally treated Judd or was involved in Judd's treatment plans, and shows Buck saw Judd on one occasion for an intake screening following his transfer from MCI-J to WCI.

[5] There is no evidence suggesting Judd was diagnosed with GID and received hormone therapy while housed in other DOC facilities.

that Judd never discussed GID during his visits with mental health professionals, but instead first mentioned GID and previous hormone treatment to Dr. Ottey on May 1, 2015.

Two questions remain. First, Judd avers that his written requests for GID assessment were properly submitted to medical personnel and ignored. This averment creates an inference that the medical records submitted in support of defendants' dispositive motion were incomplete. Defendants shall address this concern. Second, health care professionals are now aware that Judd believes he suffers from GID. The court shall require supplemental information concerning any medical and/or mental health care provided to Judd in this regard subsequent to May 1, 2015.

For these reasons, a separate order shall be entered dismissing Wexford; denying Buck and Gilmore's motion for summary judgment without prejudice; and requiring a status report from counsel for Wexford.

Date: 11/10/15

J. Frederick Motz
United States District Judge

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 NOV 10 PM 3:55

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY